UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>TEXAS OIL AND GATHERING, INC.;<br>JOHN KESSEL; and<br>EDGAR PETTIJOHN,<br><br>Defendants. | § § § § § § § § § § § CIVIL ACTION NO. 4:07-CR-00466 |

### MEMORANDUM AND ORDER

Before the Court is Defendants' Supplemental Motion to Suppress, jointly filed by Texas Oil and Gathering, Inc. ("Texas Oil and Gathering"), John Kessel, and Edgar Pettijohn. (Doc. No. 60.) The Motion seeks to suppress statements made by Kessel and Pettijohn during a search of the Texas Oil and Gathering facility conducted in June 2003. The Court held an evidentiary hearing on the Motion on August 20, 2008, and the parties later submitted briefs. After reviewing the parties' arguments and the relevant law, the Court finds that Defendants' Supplemental Motion to Suppress should be denied.

I.   ANALYSIS

Defendants contend that Kessel and Pettijohn's statements must be suppressed because they were made in response to custodial interrogation conducted prior to each Defendant having been read *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). In *Miranda*, the Supreme Court held that, in order to protect a suspect's right against self-incrimination, law enforcement officials must inform a suspect in custody of his right to remain silent, that any statement he makes may be used as evidence against him, and

that he has a right to retained or appointed counsel. *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). A suspect is "in custody" for purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Courtney*, 463 F.3d at 336 (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc)). In the present case, it is undisputed that Defendants were not formally arrested; therefore, the issue is whether they were ever in "custody." Whether a suspect is in custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances. *Yarbrough v. Alvarado*, 541 U.S. 652, 663 (2004). The Supreme Court has described the *Miranda* custody test as follows:

> Two discrete inquires are essential to the determination: first, what were the circumstances surrounding the interrogation, and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Yarbrough*, 541 U.S. at 663 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Because courts take a case-by-case approach to resolve questions of custodial interrogation, a "particularized rendition of the facts" is required. *U.S. v. Akin*, 435 F.2d 1011, 1012 (5th Cir. 1970).

## II. FACTS SURROUNDING DEFENDANTS' INTERROGATION

Following an explosion at the BSLR Operating, Ltd. facility, the Environmental Protection Agency ("EPA") sought and obtained a search warrant for the Texas Oil and

Gathering facility in Alvin, Texas. (Doc. No. 48, 1; Doc. No. 55, Ex. A.)[1] Texas Oil and Gathering operates a chemical plant and also a trucking service. (Mot. Hr'g Tr.110:13-17, Aug. 20, 2008.) On June 11, 2003, at approximately 9:55 a.m., a convoy of ten law enforcement vehicles carrying about sixteen officers converged on the facility. (Hr'g Tr. 11:5-14.) Some of the officers were wearing badges, and some were visibly carrying weapons. (*Id.* at 11:17-25.) Agent Willie Stevens of the EPA was the agent-in-charge of the raid. (*Id.* at 41:10-11.)

Texas Oil and Gathering has about 12 to 15 employees, all of whom were present on the day of the search. (*Id.* at 110:21-25.) Upon arrival, law enforcement officials secured the facility and posted an agent at the entrance. (*Id.* at 12:11-14.) Agent Stevens instructed the officers to identify the Texas Oil and Gathering employees and then to tell them they could leave. (*Id.* at 13:1-2.)[2]

Approximately 20 minutes after arriving at the facility, Agent Stevens and Special Agent Jack Walker of the FBI approached Defendant Kessel, who at the time was the president of Texas Oil and Gathering. (*Id.* at 12:7-16.) Agent Stevens told Kessel that he would "like to ask him a couple of questions" and inquired if there was someplace cooler

---

[1] The facts set out here were gathered from the evidentiary hearing and Pettijohn's Affidavit. Unless otherwise noted, the facts are undisputed.

[2] Defendant Kessel testified that agents informed the Texas Oil and Gathering employees, who had gathered outside, that they had to stay at the facility, but that contractors could leave. (Mot. Hr'g Tr. at 118:14-19.) Kessel's description of the events is not supported by other evidence. Kessel admitted that his son was permitted to leave the facility to attend class at the University of Houston. (Hr'g Tr. at 119:3-10.) Shirley Rodriguez, the Texas Oil and Gathering office manager, testified that no one ever told her she was free to leave (*id.* at 96:25-97:2), but she admits that no one ever told her she could not leave. (*Id.* at 101:7-10.) Her car was parked inside the Texas Oil and Gathering facility, and she had access to it throughout the day. (*Id.* at 102:17-103:3.) In fact, it was Defendant Pettijohn who told her she could go home later that afternoon, sometime before 5:00 p.m. (*Id.* at 99:7-15.) Richard Castleberry, an electrical contractor who was present the day of the search (*Id.* at 104:12-14) testified that, once he told the officers that he was not a Texas Oil and Gathering employee, he was told to leave. (*Id.* at 106:20-25.) The officer speaking with Castleberry told him that they were going to question the Texas Oil and Gathering employees (*Id.* at 107:6-7), but Castelberry did not witness any Texas Oil and Gathering employees being told to stay or being restrained from leaving the facility. (*Id.* at 108:22-24.)

where the men could speak. It was approximately 90 degrees outside at the time. (*Id.* at 52:21-25.) Kessel then led the agents up a flight of stairs to an air-conditioned control room. (*Id.* at 14:13-23.)[3] The room was about 20 by 20 feet, and it contained two chairs and a computer. The room also had two large bay windows which looked out over the rest of the Texas Oil and Gathering Facility. (*Id.* at 16:1-9.) Agent Stevens was wearing cargo pants and a blue windbreaker that had a shield and the name of his agency printed on it. (*Id.* at 63:14-17.) He was armed, but his handgun was covered by his windbreaker. (*Id.* at 63:18-21.) Agent Walker was wearing cargo pants and a polo shirt bearing the FBI shield, covered by a fishing vest. (*Id.* at 154:3-10.) Agent Walker was also armed, but his weapon was not visible. (*Id.* at 155:6-8.)

According to Agents Walker and Stevens, once in the control room, they began questioning Kessel. Each agent sat in a chair approximately four feet away from Kessel (*Id.* at 22:18), and Kessel sat on a countertop. (*Id.* at 22:5-6.) The door was situated between Kessel and the agents and located about six to seven feet away from Agent Stevens. (*Id.* at 54:14-18.) Kessel had a cell phone on his person during the interview, and he was sitting near two other phones in the room. (*Id.* at 54:19-55:6.) Agent Stevens began the interview by thanking Kessel for speaking with them, and, according to Agent Stevens, Kessel responded that he was "glad this had all come out" and that now "they could do it right." (*Id.* at 57:11-13.) Stevens admits that he never specifically told Kessel that he was free to leave, but he did tell Kessel that he did not have to speak with him. (*Id.* at 14:9-10.) Neither agent read Kessel his *Miranda* rights before asking him questions. (*Id.* at 17:2-6.) At one point, Kessel asked

---

[3] Kessel contends that he did not "lead" the agents up the stairs. The Court does not find this testimony credible. Kessel, as the president of the company, was much more likely to be familiar with the facility than the agents and know the location of an air-conditioned room. In fact, Agent Walker testified that he had never been to the facility before. (Mot. Hr'g Tr. 160:4-5.)

the agents if he needed a lawyer. Agent Stevens testified that he told Kessel "it is entirely up to you" and "you don't have to talk to me; you can tell me to go jump in a lake if you like."[4] (*Id.* at 23:14-16.) According to the agents, the tone of the interview was relaxed, not confrontational or aggressive. (*Id.* at 25:22-24.) The agents never told Kessel that he did not need a lawyer or that he was under arrest. Kessel never asked to make a phone call (*id.* at 55:3-6), and he did not request or attempt to leave the room. (*Id.* at 57:4-8.) At the end of the interview, which lasted approximately 30 minutes (*id.* at 17:9), the agents sent Kessel, unescorted, to find Pettijohn.[5] (*Id.* at 27:13-18.) Kessel brought Pettijohn back to the same room to speak with the agents, and he then left the room unescorted. (*Id.* at 27:22-28:11.)[6]

Agents Stevens and Walker interviewed Pettijohn in the same control room where they had spoken with Kessel. (*Id.* at 20:21-23.) According to the agents, they did not read Pettijohn his *Miranda* rights (Pettijohn Aff., July 17, 2008), but Agent Stevens told Pettijohn that he was free to leave if he wanted. (*Id.* at 46:5.) Both agents also testified that Pettijohn did not ask for an attorney. (*Id.* at 48:16.) During the interview, Pettijohn and the agents sat at equal distances from the door. (*Id.* at 62:11-13.) The agents testified that all the men were seated during the interview. (*Id.* at 14-17.) At the end of the interview, which lasted about one hour, Pettijohn left on his own accord. (*Id.* at 64:6-7.)

---

[4] Kessel testified that Agent Stevens told him that "lawyers will only get in the way" and that they would go "real easy" on him if he did not obtain counsel. (Mot. Hr'g Tr., 130:2-9.) The Court does not find these statements to credible.

[5] Kessel testified that Agent Walker went to find Pettijohn while he waited in the control room with Agent Stevens. (Mot. Hr'g Tr., 132:10-12.) The Court does not find this testimony credible, however, because Agent Walker testified that he had never met Pettijohn before the day of the search and that he was not familiar with the Texas Oil and Gathering facility. (Hr'g Tr. at 178:6-14.)

[6] Kessel testified that he was escorted throughout the rest of the day and that he never felt free to leave. The Court does not find his testimony credible. He stated that he felt free to leave at the end of the day, when the agents were "wrapping up," and that he would have stayed at the facility even if he was told that he was free to leave at anytime, just to see what the agents were doing. (Mot. Hr'g Tr., 137:23-25.) Kessel admitted that he did not attempt to leave during the day and that no one prevented him from using his cell phone, or any other phone, throughout the day.

Pettijohn, in his Affidavit, gives a very different account of the interview. He states that he was "never told that [he] did not have to answer questions by the officers" and that he "felt like [he] had to answer their questions." (Pettijohn Aff., July 17, 2008.) Pettijohn also testifies that one of the agents used a threatening tone towards him and that when he stood up to leave, the agents told him to sit back down. (*Id.*) Finally, Pettijohn contends that he asked for an attorney and was told he did not need one. (*Id.*) During the interview, he allegedly attempted to leave the room, but one of the agents blocked his path to the door. (*Id.*)

After they were interviewed by the agents, both Kessel and Pettijohn remained on the Texas Oil and Gathering facility for the rest of the afternoon. They were free to roam around the facility. (Mot. Hr'g Tr., 28:19-25; 64:15-16.) The men even walked the facility with the agents for part of the afternoon. (Hr'g Tr. at 175:10-22.) The search of the facility lasted from June 11 to June 13; Kessel and Pettijohn both returned to the facility on June 12.[7] (*Id.* at 32:10-14.)

## II.   WHETHER DEFENDANTS WERE "IN CUSTODY"

Defendants begin by arguing that the manner in which the search of the facility was carried out would cause a reasonable person to feel that he was under arrest. In support of this argument, Defendants point out that there were a large number of officers involved in the search, that witnesses recognized the vehicles as belonging to the law enforcement, that some agents were armed and uniformed, and that an agent was posted at the facility's front gate.

The Supreme Court confronted similar facts in *INS v. Delgado*, 466 U.S. 210 (1984), in which immigrant workers argued that INS surveys conducted in factories constituted a

---

[7] Kessel stated that he was not allowed inside the facility on June 12, but that the agents allowed Pettijohn inside the facility. (Mot. Hr'g Tr., 139:13-140:11.)

Fourth Amendment seizure of the entire factory workforce.[8] As in the instant case, the INS began its surveys by posting an agent at the factory's exits. The Supreme Court found that the agents' presence at the exit was not sufficiently coercive to constitute a "seizure" of the workers because the record did not indicate that the agent actually prevented people from leaving. *INS v. Delgado*, 466 U.S. at 218. The record before this Court suffers from the same omission. While witnesses testified that they felt they could not leave because an agent was at the gate, no witness testified that he personally had been prevented from leaving, or that he saw another employee prevented from leaving. The possibility of being questioned if he attempted to leave would not cause a reasonable person to feel that he had been seized or detained. *Id*; *see also U.S. v. Sylvester*, 848 F.2d 520, 523-524 (5th Cir. 1988) (holding that suspects who, while hunting, were issued a citation in an open field by a lone officer should not have felt they were in custody because their vehicle was blocked during the questioning). In fact, the testimony seems to indicate that Kessel freely chose to leave at the end of the day when he saw the agents "wrapping up" their search. Shirley Rodriguez also testified that it was Pettijohn, not a law enforcement official, who ultimately released her from the facility.

While the large number of law enforcement officials involved in the search increases the probability that a reasonable person would have felt that his freedom had been restricted, the evidence indicates that Kessel and Pettijohn were only questioned by two of the agents. When a reasonable suspect is questioned by only one or two officers, it mitigates his sense of

---

[8] Even though the Supreme Court's reasoning in *INS v. Delgado* related to Fourth Amendment seizure, not custody, it is still useful for understanding the instant case. As the Fifth Circuit explained in *Bengivanga*, a person has been seized when, in view of the circumstances, a reasonable person would not feel free to leave. A restriction that amounts to seizure however, does not necessarily rise to the level of custody. "The core meaning both of 'seizure' in the Fourth Amendment sense, and of 'custody' in the Miranda sense, appears to be the same: the restraint of a person's 'freedom to walk away' from the police. The critical difference between the two concepts, however, is that custody arises only if the restraint on freedom is a certain degree -- the degree associated with formal arrest." *Bengivenga*, 845 F.2d at 598 (internal citations and quotations omitted). If the factory workers in *INS v. Delgado* had not been seized, it follows that they were not in custody.

vulnerability. *U.S. v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996) *overruled on other grounds*, *U.S. v. Brown*, 161 F.3d 256 (5th Cir. 1998) (citing *Bengivenga*, 845 F.2d at 598). This holds true even if the interview occurs in conjunction with a search involving a large number of officers. *See Fike*, 82 F.3d at 1325 (finding, when the suspect was only questioned by two officers while several other officers searched his home, that the number of officers factor weighed equally for both sides).

Some agents wore uniforms, and some were armed. There was no credible evidence, however, indicating that, in general, the law enforcement personnel's behavior was so coercive that a reasonable person would have felt he was under arrest. *See U.S. v. Chavez*, 281 F.3d 479, 484 (5th Cir. 2002) (holding that, when a suspect was questioned in a public area by uniformed officers who did not draw their weapons or tell him he was not free to leave, the suspect should not have felt that he was in custody). There was no testimony that, while executing the warrant, the agents brandished their weapons or used intimidating behavior.

The Court now turns to the agents' interview with Kessel. The particular circumstances of the interview also suggest that Kessel was not in custody. The fact that the interview took place in a closed room, outside of public view, might initially suggest that the questioning was custodial. Kessel actually chose the room, however, which tends to indicate that the interview was non-custodial. *See, e.g., U.S. v. Courtney*, 463 F.3d at 336. So does the fact that the interview took place at Kessel's place of business, as opposed to a police station, and that, when the interview concluded, he was free to roam about the facility.[9] *Id.*

---

[9] The Court has already noted that it does not find Defendant Kessel's testimony that he was "escorted" by agents throughout the day of June 11 to be credible. Even if his testimony is true, however, the behavior Kessel describes only amounts to a "seizure," not custody. *See U.S. v. Collins*, 972 F.2d 1385, 1405 (5th Cir. 1992). Kessel did not testify that while he was "escorted" the agents limited his movement to a certain part of the

While Kessel was probably prevented from carrying out the normal business of the facility during the search, a reasonable person would have assumed that he could continue working once the search concluded. *Id.; INS v. Delgado*, 466 U.S. at 336.

Throughout the interview, Kessel had access to his cell phone, but he did not ask to use it or attempt to call a lawyer. Additionally, the fact that the agents did not tell Kessel that he had to speak with them, or that he could not leave, indicates that the interview was non-custodial. *U.S. v. Courtney*, 463 F.3d at 336. Finally, Kessel's discussion with the agents was relatively short, lasting only thirty minutes.

Pettijohn was summoned to the control room by Kessel, not the agents, which would signal to a reasonable suspect that he was not under arrest. While Pettijohn's interview was twice as long as Kessel's, the Fifth Circuit has not established a constitutional time limit for determining when an interview becomes custodial, and the length of the interview is only one factor courts consider. *U.S. v. Harrell*, 894 F.2d 120, 124 (5th Cir. 1990). Furthermore, the fact that the agents told Pettijohn that he was free to leave, and that Pettijohn knew that the agents had released Kessel after his interview, should have indicated to Pettijohn that he was not in custody.[10] At the end of the interview, Pettijohn was in fact released and, like Kessel, he freely left the facility later that afternoon. Given these facts, the Court concludes that neither Defendant was in custody during the search of the facility, and that their statements should be admitted.

---

facility or prevented him from going where he wanted. As mentioned earlier, it appears that Kessel left at the end of the day on his own accord.

[10] The Court does not find credible Pettijohn's accusation that, when he attempted to leave the control room, the agents blocked the door and ordered him to sit down. Agent Stevens and Walker, who do not work for the same agency, and who did not observe each other's hearing testimony, both confirmed that these events never occurred. Additionally, the agents had just conducted an interview with Kessel, who did not accuse them of such tactics.

Defendants make much of the fact that their attorney, Farley Burge, was allegedly denied access to the Texas Oil and Gathering facility on the second day of the search. At the time of the search, Texas Oil and Gathering was represented by Kelly Brown at the law firm of Crain, Caton, and James. On June 12th, Brown asked Burge, an associate at the firm, to go to the facility to see if the Texas Oil and Gathering managers needed legal representation. (Mot. Hr'g Tr., 92:7-8.) When Burge arrived at the facility, he was allegedly told that he could not enter because the site was secure. (*Id.* at 88:1-2.) He stayed at the gate for about one hour. (*Id.* at 88:5.) Burge attempted to call Kessel, but he cannot remember if he reached him. (*Id.* at 89:11-12.) Regardless, there was no testimony that Burge arrived at the facility at Kessel's request or that Kessel knew Burge denied access. Since the incident did not even occur until after Kessel had spoken with the agents, it could not have affected his belief as to whether his freedom was restrained. It is therefore irrelevant to this Motion.

### III.  CONCLUSION

Defendants' Supplemental Motion to Suppress is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 20th day of March, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.